JS

JIM SCHRATZ
and ASSOCIATES

Ms. Michelle Skeens
Holden Carr & Skeens
200 Reunion Center
Nine East Fourth Street
Tulsa, OK 74103

*Re: Tubbs v. AIG Insurance Services, Inc.*

Dear Ms. Skeens:

This office was retained on behalf of Commerce & Industry Insurance Company and Domestic Claims, a division of AIU Holdings ("AIU") to provide expert opinions concerning the claims handling practices of AIU in this matter. It is my understanding that discovery is not complete and I reserve the right to change, amend or modify the opinions expressed herein based on any additional information that may be provided to me.

**BACKGROUND AND QUALIFICATIONS**

1. My current business address is 1327 Felder Road, Sonoma, California, 95476.

2. A copy of my current resume is attached as Exhibit "A".

3. My standard hourly rate is $250 and $400 for deposition testimony and trial testimony and that is the rate at which I will be compensated in this action.

4. I graduated from the University of San Francisco Law School in 1976 where I was Editor-in- Chief of the Law Review and then went into private practice for four years.

5. In 1980, I joined the General Counsel's Office at Fireman's Fund Insurance Company, where I performed both litigation and transactional work.

6. In 1984, I joined the Claims Department where I was responsible for supervising the lawsuits against Fireman's Fund nationwide that alleged improper claims handling or insurance bad faith. Within this role, I would review hundreds of claims files from around the country to determine if Fireman's Fund claims handlers had properly investigated the claim and met or exceeded the industry standard. According to company policy and case law, the measurement I used in determining whether the claim had been properly investigated and handled was whether the insurance company gave as much consideration to the insured's interests as to its own.



EXHIBIT
3

JIM SCHRATZ and ASSOCIATES

7. In approximately 1986 I established the Major Litigation Unit at Fireman's Fund, which was responsible for many of the complex, high-profile, high-exposure, labor-intensive cases throughout the country. As an Assistant Vice President, I not only supervised a staff of adjusters around the country, but also personally adjusted and investigated many of these cases. Within this dual role of supervisor and hands-on adjuster, I paid special attention to assuring that all of the adjusters who reported to me met or exceeded the industry standard in investigating claims, i.e., giving as much consideration to the insured's interests as to its own. Many of these cases involved numerous carriers and at times I worked with the insured to determine if other carriers who were responsible also lived up to the industry standard.

8. In 1990, I was promoted to Vice President, Major Claims, where my duties were expanded to include any matter around the world which was reserved at $3 million or more. Within this role, I would meet with the President of Fireman's Fund, the Executive Vice President of Claims, a member of the General Counsel's Office, and other senior officers to analyze these claims and make sure that they were being properly investigated and adjusted. In addition, my duties were expanded to include supervising the Special Investigations Unit which was comprised of approximately 100 adjusters throughout the country and was responsible for investigating possible insurance fraud. Again, within this role, I paid special attention to assuring that these adjusters met the industry standard for proper claims handling.

9. In January 1994, I started Jim Schratz and Associates, which provides consulting and expert witness services on behalf of both insurance companies and insureds. Over the past fifteen years I have reviewed thousands of claims files, numerous claims manuals, and numerous cases from around the country relating to the issues of proper claims handling and the duty of good faith and fair dealing. I have also attended numerous seminars and presentations and have made various presentations concerning these issues over the years. I have also qualified as an expert witness in numerous jurisdictions on these issues.

Based on my experience over the past 28 years connected with the insurance industry, and based on the experience described above, it is my opinion that while various state laws may differ, i.e. some states describe the standard for proper claims handling as a "reasonableness" standard, while other states may require the conduct be "vexatious" or "arbitrary," the standard that the carriers use in the industry is a national standard: reasonableness. Based on a review of thousands of claims files and numerous claims manuals or "Best Practices Guidelines," it is clear that carriers hold their own adjusters to a standard of reasonableness or fairness. Put another way, the investigation must be reasonable or "fair". Numerous courts have attempted to "flesh out" this standard by stating that the insurance company must give as much weight to

JIM SCHRATZ and ASSOCIATES

the insured's interests as to its own. See e.g. *Eagan v. Mutual of Omaha Ins. Co.*, 24Cal.3d 809 (1979) and *American Fidelity & Casualty v. The Greyhound Corp.*, 258 F.2d 709 (1958).

It is my opinion that the carrier is not required to always have made the correct decision to meet this standard, but the process must be fair and reasonable. A review of any claims file quickly discloses that an adjuster, during the course of a proper investigation, reaches many "decisions points" where a decision must be made. For example, "Is there coverage?" "Is the insured liable?" "Is the damage related to the occurrence?" At each of these decision points, in order to meet the industry standard, the file must clearly reflect that the adjuster performed a fair, thorough, prompt investigation, and gave as much weight to the insured's interests as to the carrier's.

Based on my personal experience of both adjusting and supervising claims, when adjusters adjust a claim they do not do so thinking about what the particular case law or statutory law concerning bad faith is in the state in which the claim is pending. This is true for a number of reasons. First, the law may be more favorable to the insurance company than the industry standard. For example, some states require that the carrier's actions be arbitrary or vexatious before it is bad faith. Other states employ the "fairly debatable standard," which means an insured must show the absence of any reasonable basis for denying the claim. If adjusters only adjusted to the bad faith standard, in some cases they would be adjusting "down" to that standard, not adjusting "up" to the overall national standard of reasonableness of giving as much weight to the insured's interests as to its own interests.

Secondly, many adjusters adjust claims in numerous states, and it would be impractical, if not impossible, for the adjusters to keep current on all the ever-changing aspects of bad faith law in each state.

## METHODOLOGY

The methodology I used in this case to determine if AIU met the industry standard for proper claims handling is the same methodology I used at Fireman's Fund in reviewing a claims file, as well as the methodology I use now whether I am reviewing the claims file on behalf of an insured or an insurance company. This methodology encompasses reviewing all of the documents that have been produced, i.e., the insurance policy, claims notes, e-mails, internal memos, proof of loss and supporting documents where appropriate, and any other documents contained in the claims file, including recorded statement, etc. Finally, I also review any depositions of the claims adjusters and supervisors that have been taken. As noted above, the standard that I use in this methodology is whether or not the insurance carrier acted reasonably.

JIM SCHRATZ and ASSOCIATES

## DOCUMENTS REVIEWED

1. Workers Compensation File Bates WC001-178
2. Claims File Bates C&I 100001-11209
3. Petition in Larry Tubbs v. AIG Insurance Services, Inc, et al
4. Plaintiff's Responses to Defendant Commerce & Industry's First Discovery Requests To Plaintiff
5. Plaintiff's First Supplemental Response To Defendant Commerce & Industry's First Discovery Requests To Plaintiff
6. Defendant Commerce & Industry Insurance Company's Privilege Log Concerning Claim File and Activity Notes
7. Worker's Compensation Policy

## BACKGROUND

Mr. Tubbs alleged that on January 26, 2006, while employed as a custodian for Trace, Inc. Mr. Tubbs sustained injury to his head and back when he was struck in the head with a brick. He was taken by ambulance to the emergency room at Comanche County Memorial Hospital. A CT scan of his head was obtained and he was taken off work. Over the next several months, Mr. Tubbs was seen by numerous doctors, a physical therapist and LDH Consultants Inc. for a vocational rehabilitation evaluation.

On November 1, 2007 there is a claims note from Ms. Ray stating; "I just called LDH Consultants and spoke with Ann and approved Option A". On that same date there is an email from Ms. Ray to Tonya Tomecek "I thought this was already approved: I responded to your email on 10-5-07 advising that I have no problems approving this. I guess it never happened. Does this facility need to contact us or does someone have to contact them? I am not sure of the proper procedure." On that same day Ms. Tomecek responded: "You just need to contact LDH and let them know. Thanks".

On November 13, 2007 the court ordered option A of the vocational rehabilitation benefits noted on pages 7-8 of the LDH report dated August 28, 2007 which included a computer with an estimated cost of $1,200.

On January 29, 2008 there is a claims note by Ms. Ray "Spoke with Julie Harvey with LDH and we agreed that she would locate a computer and fax me an estimated invoice from the retailer, and I will issue check payable to LDH Consultants".

On January 31, 2008 LDH contacted Dell who provided a quote for $1,013.11. This quote was faxed to AIG adjuster Ms. Ray. AIG was told Dell wanted the money up front and LDH said they would make the payment but needed a credit card number. On February 12, 2008 Ms. Ray advised LDH that AIG does not have a credit card for such

Case 5:08-cv-01014-F Document 96-5 Filed 06/23/2009 Page 2 of 3

JIM SCHRATZ and ASSOCIATES

purposes and suggested that Mr. Tubbs purchase the computer and then get reimbursed by AIG, or that his attorney could make the purchase and then get reimbursed.

On March 26, 2008 LDH received a court order authorizing a computer at the cost of $1,200.

On July 7, 2008 there is a claims note "Shannon, please call asap to the LDH person at the below number to get computer approved for this claimant per an order in March for Vocational Rehab". On that same day there is a response from Joyce Sudds "Great, she will call this morning and get this taken care of".

On July 8, 2008 Ms. Hawkins contacted LDH advising she would provide assistance in the purchase of the computer. On July 28, 2008 LDH contacted AIG and spoke with Angela Tulle who provided instructions for the purchase of the computer. She stated that LDH should obtain a new computer quote and send AIG the invoice and AIG would send a check to Dell on July 30, LDH submitted a new quote to AIG for $1,124.

On or about August 1, 2008 Mr. Tubbs filed a complaint against AIG

Two weeks later on August 14, 2008 the AIU adjuster Shannon Hawkins contacted LDH and advised them that AIG needed a tax ID number for Dell in order to be able to submit a check for Mr. Tubb's computer. According to the LDH memo Ms. Hawkins said she would consult the legal department regarding the need for the number.

Also on August 14, 2008 Shannon requested a check be sent overnight in the amount of $1,165.29 to Dell Catalog Sales L.P. This included the total for the computer, printer and supplies. On that same day the check request was processed and sent to Dell via UPS.

## FINDINGS AND OPINIONS

Based on my review of the documents and based on my experience as an adjuster and former claims executive it is my opinion that AIG met the industry standard for proper claims handling and did not breach the duty of good faith and fair dealing. Within approximately 60 days after receiving the LDH report of August 28, 2007 which included option A, AIG personnel agreed to provide a computer even before the court order was issued on November 13, 2007. Through no fault of AIG Dell Computer required payment in advance and neither Mr. Tubbs, nor his attorney, nor LDH would make such an advance payment and then seek reimbursement from AIG.

JIM SCHRATZ and ASSOCIATES

AIG promptly issued the check on August 14, 2008. At no time did AIU refuse to pay for the computer or deny the claim. The fact that AIU approved Option A even before the court order clearly demonstrates it acted reasonably and did not act in bad faith. Furthermore based on the documents described above it appears that AIU thought that LDH was going to pay for the computer and then seek reimbursement from AIU

Please feel free to call me if you have any questions.

Very truly yours,

JAMES P. SCHRATZ

JPS:lh

Enclosure